IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FLETCHER K. ROBINSON,          )
                               )
          Plaintiff,           )
                               )
v.                             )          CIVIL ACTION NO. 17-0173-MU
                               )
NANCY A. BERRYHILL,            )
Acting Commissioner of Social  )
Security,                      )
                               )
          Defendant.           )

## MEMORANDUM OPINION AND ORDER

Plaintiff Fletcher K. Robinson brings this action, pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3), seeking judicial review of a final decision of the

Commissioner of Social Security ("the Commissioner") denying his claim for

Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI"),

based on disability. The parties have consented to the exercise of jurisdiction by

the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this

Court. (Doc. 19 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.

R. Civ. P. 73, the parties in this case consent to have a United States Magistrate

Judge conduct any and all proceedings in this case, … order the entry of a final

judgment, and conduct all post-judgment proceedings.")). *See also* Doc. 21. Upon

consideration of the administrative record, Robinson's brief, the Commissioner's

brief, all other documents of record, and oral argument, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

## I. PROCEDURAL HISTORY

On April 24, 2014, Robinson applied for a Period of Disability and DIB, under Title II of the Social Security Act, and for SSI, based on disability, under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383d, alleging disability beginning on March 25, 2014. (Tr. 235-46). After his application was denied at the initial level of administrative review on August 1, 2014, Robinson requested a hearing by an Administrative Law Judge (ALJ). (Tr. 136-42). After an initial hearing was held on October 16, 2015, and a supplemental hearing was held on February 24, 2016, the ALJ issued an unfavorable decision finding that Robinson was not under a disability from the date the application was filed through the date of the decision, April 21, 2016. (Tr. 33-107). Robinson appealed the ALJ's decision to the Appeals Council, which denied his request for review on March 13, 2017. (Tr. 1-6).

After exhausting his administrative remedies, Robinson sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed an answer and the social security transcript on July 20, 2017. (Docs. 7, 8). On August 18, 2017, Robinson filed a brief in support of his claim. (Doc. 9). The Commissioner filed her brief on December 4, 2017. (Doc. 16). Oral

---

[1] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 19 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

argument was held before the undersigned Magistrate Judge on January 30, 2018. (Doc. 20). The case is now ripe for decision.

## II.  CLAIM ON APPEAL

Robinson alleges that the ALJ's decision to deny him benefits is in error because the ALJ's Residual Functional Capacity (RFC) assessment was not supported by substantial evidence. (Doc. 9 at pp. 1- 2).

## III. BACKGROUND FACTS

Robinson was born on July 27, 1965, making him 48 years old at the time he filed his claim for benefits. (Tr. 296). Robinson alleged disability due to PTSD, prostate cancer, diabetes, depression, high blood pressure, and back pain. (Tr. 279). He graduated from high school on June 3, 1983, attending regular education classes. (Tr. 280). After high school he joined the Army and served for almost ten years, including a deployment in the Gulf War. (Tr. 94). He worked from 1994 to 2014 as a parts manager for the Mobile County sheriff's garage. (Tr. 280-81). He takes care of his own personal care, although his wife does remind him to take his medicine because he has focus issues. (Tr. 289-90). He is able to iron, do laundry, and some minor cleaning chores. (Tr. 290). He can pay bills, count change, handle a savings account, and use a checkbook/money orders with his wife's help. (Tr. 291). He only drives short distances with someone with him because he does not know when his PTSD will be triggered. (Tr. 291). He goes outside at his home on a daily basis. (Tr. 291). He spends his time at home with his family or at church, going to PTSD therapy, and going to doctor's appointments. (Tr. 292). He enjoys watching television and fishing, but says he

cannot fish alone anymore. (Tr. 292). He testified at the first hearing that he had

to retire from his employment due to the symptoms caused by his PTSD and

having to miss work to attend sessions for treatment of his PTSD. (Tr. 98-100).

After conducting the hearings, the ALJ made a determination that Robinson had

not been under a disability during the relevant time period, and thus, was not

entitled to benefits. (Tr. 36-65).

## IV. ALJ'S DECISION

The ALJ made the following relevant findings in her April 26, 2016 decision:

**3. The claimant has the following severe impairments: Prostate cancer, obesity, diabetes mellitus, osteoarthrosis, essential hypertension, anxiety disorders, and affective disorders. (20 CFR 404.1520(c) and 416.920(c)).**

The medical evidence of record documents that the claimant has received mental health treatment through the Veteran's Administration Health Care System (VA) since at least May 2010. A document dated May 5, 2010 indicates that the claimant was scheduled for admission to the Psychosocial Rehabilitation Residential Treatment Program (PRRTP) at the VA Gulf Coast Veterans Health Care System in Biloxi, Mississippi on May 17, 2010. (Exhibit 1F). The evidentiary record contains no other documentation regarding this admission. (Exhibit 18E).The record does contain a "Certificate of Completion" dated July 9, 2010, signed by a psychologist, two social workers, a recreation therapist, and a chaplain, indicating that the claimant successfully completed the "PTSD Intensive Outpatient program" through the PRRTP. (Exhibit 2F).

The evidentiary record further documents that, since January 2011, the claimant has received mental health treatment through the Gulf Coast VA Health Care System for diagnoses of post-traumatic stress disorder (PTSD), Chronic Depression, and OCD. (Exhibits 3F, 4F, 7F, and 10F). The treatment records reflect Global Assessment of Functioning (GAF) scores of 45 to 50 since 2012. (Exhibits 4F at pages 123 and 232, 10F at pages 64, 69, 71, and 109, and 21F at page 6). The claimant has been followed medically at the VA by staff psychiatrist Douglas Ewing, M.D., since February 2011. A treatment note from Dr. Ewing dated

February 6, 2014, approximately one month prior to the claimant's alleged onset date, reflects that the claimant presented with worries about the responsiveness of his prostate cancer to treatment. The claimant reported having no medication side effects, and his mental status examination (MSE) revealed that he reported his mood was "down" and that his affect was subdued, but appropriate to topic. Dr. Ewing further noted at that time that the claimant was oriented to person, place, time, and situation, that he denied current suicidal or homicidal ideation, plan, or intent, that his thoughts were logical and goal-directed without evidence of thought disorder or delusion, that feelings of hopelessness were not elicited, and that the claimant did not appear to be responding to auditory/visual hallucinations. Dr. Ewing diagnosed the claimant with PTSD. A psychiatric outpatient note a little over six weeks later, on the claimant's alleged onset date, March 25, 2014, indicates that the claimant complained to Dr. Ewing of symptoms of weekly intrusive thoughts, weekly dreams/nightmares, weekly flashbacks, psychological distress, psychological reactivity, efforts to avoid thoughts, feelings, people, places, and events, markedly diminished interest in activities, social isolation from others, loss of ability to feel emotions, sleep disturbances, anger outbursts, poor concentration, hypervigilance, and exaggerated startle response. The claimant further reported having "chronic persistent dysphoria and anxiety and social and interpersonal restriction." The claimant denied current suicidal ideation, plan, or intent and he denied persistent morbid thoughts. However, Dr. Ewing noted that the claimant's MSE on March 25, 2014 was remarkable only for "low" mood and "mild to moderately glum" affect. All other aspects of the claimant's MSE on that date were within normal limits. The claimant's diagnosis on that date was chronic PTSD. (Exhibit 3F at pages 1-11).

A review of the claimant's mental health treatment records from the VA Medical Center from 2014 and 2015 reflects Dr. Ewing, and VA staff psychologist Susan K. Rhodes, Ph.D., treated the claimant for PTSD and depression with psychotropic medications and individual therapy on a regular basis. The records indicate that, although the claimant continued to complain of symptoms of "self-injurious thoughts," recurrent, involuntary, and intrusive distressing memories of events that occurred during his military service, psychological distress, and avoidance of distressing memories, thoughts, or feelings associated with events that occurred during his military service, he consistently denied having active suicidal intent, and he also consistently denied having feelings of hopelessness. The treatment records do not reflect that the claimant's mental health treatment providers, Dr. Ewing and

Dr. Rhodes, documented any significantly abnormal mental status examination findings during their office visits with the claimant. For example, at the claimant's July 2014 visit with Dr. Ewing, the claimant's MSE appeared normal, and the claimant's mood was reported as "IT'S GOOD" and his affect was subdued but appropriate to topic. Dr. Ewing further noted that the claimant "smiled broadly at times." (Exhibit 7F at page 37). On October 22, 2014, Dr. Ewing recorded very similar MSE findings, and noted that the claimant reported that his mood was "ALRIGHT" and that his affect was subdued but appropriate to topic. Dr. Ewing again observed that the claimant "smiled broadly." (Exhibit 10F at page 79). At his visit with the claimant on May 20, 2015, Dr. Ewing again noted no abnormalities in the claimant's MSE and he noted that the claimant reported that his mood was "GOOD," and he observed that the claimant's affect was "smiling, friendly and engaging" and appropriate to topic. (Exhibit 10F at page 116).

On mental status examination of the claimant on October 20, 2014, Dr. Rhodes observed that the claimant demonstrated agitated psychomotor behavior and stated that his mood was depressed (with congruent affect), but she further noted that the claimant was alert and oriented to person, place, time, and purpose, that his grooming and hygiene were properly maintained, that his speech was average in rate and tone, that his thoughts were logical and goal-directed, that there was no evidence of psychosis, and that his attention, concentration, and memory appeared adequate. The claimant reported having suicidal thoughts, but he denied any intent to act upon it. Dr. Rhodes diagnosed the claimant with PTSD and Depression NOS. (Exhibit 10F at pages 83-84).

The claimant was admitted to the PTSD Intensive Outpatient Program, PRRTP, in the Gulf Coast Veterans Health Care System, from March 31, 2015 to May 19, 2015. The record indicates that the claimant successfully completed the program. (Exhibit 10F at pages 112; Exhibit 11F).

On June 11, 2015, Dr. Rhodes observed that the claimant's mood appeared depressed with congruent flat affect, but he was alert and fully oriented, that he was well-groomed with good hygiene, that his speech was normal, that his thoughts were logical and goal-directed, that there was no evidence of psychosis, and that he denied suicidal or homicidal ideation and did not endorse any factors interfering with continued maintenance of safety from harm to self or others. Dr. Rhodes noted very similar findings at her visit with the claimant on June 30, 2015. Dr. Rhodes diagnosed the claimant with PTSD and Depressive Disorder,

NOS. (Exhibit 10F at page 109). On September 2, 2015, Dr. Ewing noted that the claimant reported that he was less anxious/irritable/reactive and that his sleep and mood were improved. The claimant's mental status examination on that date was essentially normal, with no suicidal or homicidal ideation, plan, or intent, and no feelings of hopelessness. (Exhibit 14F at pages 8-9).

Dr. Ewing wrote a letter on April 9, 2014 in support of the claimant's VA compensation and pension claim based on PTSD. In that letter, Dr. Ewing indicated that the claimant continued to experience "significant distress related to his PTSD," despite treatment with psychotropic medications and individual psychotherapy. Dr. Ewing listed the claimant's daily to weekly symptoms and he stated that the claimant's symptoms were significant and, in his opinion, the claimant was not "cognitively, interpersonally or affectively capable of functioning in the workplace" at that time due to his PTSD. (Exhibit 4F at pages 94-95). Dr. Ewing also completed disability forms on the claimant's behalf for the Retirement Systems of Alabama (RSA) on April 28, 2014 and July 8, 2015. (Exhibits 12E, 5F, and 9F). In both forms, Dr. Ewing opined that the claimant was "totally incapacitated" from duty due to PTSD, depressed mood, chronic anxiety, low frustration tolerance, and emotional reactivity, and that his employer could not make any accommodations which would allow the claimant to be capable of employability. In the April 28, 2014 form, Dr. Ewing also noted that the claimant's "anxiety/agitation" precluded tolerance of the workplace, and in the July 8, 2015 form, he stated that the claimant was "intolerant of social demands of workplace settings."

The record documents that the claimant was granted disability retirement from The Retirement Systems of Alabama effective June 1, 2014. (Exhibit 5D).

On June 19, 2014, clinical psychologist Jennifer M. Jackson, Psy. D., completed an Initial PTSD Disability Benefits Questionnaire on the claimant for "internal VA or DoD use only." Dr. Jackson indicated that the claimant's diagnoses were PTSD and Unspecified Depressive Disorder, and that he had overlapping symptoms with one condition exacerbating the other. Dr. Jackson opined that the claimant had "occupational and social impairment with reduced reliability and productivity." (Exhibit 7F at pages 39-46).

The claimant received a VA rating decision on July 25, 2014 which found that he had a 50 percent disability rating effective August 24, 2009 due to PTSD with unspecified depressive disorder based on the claimant's difficulty in adapting to a work like setting, disturbance of motivation and mood, difficulty in establishing and maintaining

effective work and social relationships, occupational and social impairment with reduced reliability and productivity, chronic sleep impairment, weekly panic attacks, anxiety, and depressed mood. (Exhibit 10D).

In the most recent VA rating decision dated May 16, 2015, the claimant received a temporary 100 percent disability rating from the VA based on his admission to the PTSD Intensive Outpatient Program, PRRTP from March 31, 2015 through May 19, 2015 for PTSD. The rating decision explained that an evaluation of 50 percent was assigned from August 1, 2010; an evaluation of 100 percent was assigned from March 31, 2015; and an evaluation of 50 percent was assigned from June 1, 2015. The claimant's overall combined rating was 50 percent for occupational and social impairment with reduced reliability and productivity due to specific symptom [sic] such as flattened affect, circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short and long-term memory; impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintain effective work and social relationships. (Exhibit 13F).

On December 9, 2015, the claimant underwent a psychiatric evaluation by VA psychiatrist Gregory W. Cummings, M.D. It is noteworthy that, in the record of the evaluation, Dr. Cummings wrote that the claimant identified with every symptom noted, i.e., sleep disturbance, loss of interest, guilty ruminations, poor energy level, decreased concentration, anhedonia, psychomotor retardation, change in appetite, and suicidal thinking. However, on mental status examination of the claimant Dr. Cummings wrote that the claimant was alert and oriented in all spheres, that he maintained adequate eye contact, that there was no obvious psychomotor abnormality, that the claimant's thought processes were logical and goal-directed and without evidence of thought disorder or perceptual disturbances, that his cognition was grossly intact in terms of immediate, recent, and remote memory functioning, that his insight was good, and that his judgment and impulse control were adequate. The only abnormalities Dr. Cummings noted were that of a depressed mood with a sad and tearful affect. Dr. Cummings diagnosed the claimant with chronic PTSD and Major Depressive Disorder, recurrent, moderate. (Exhibit 21F).

The record contains correspondence from the Department of Veterans Affairs, Central Arkansas Veterans Healthcare System, dated February 1, 2016, which indicates that the claimant's mental health

provider submitted an application for the claimant for the PTSD Domiciliary Program at Central Arkansas Veterans Healthcare System in North Little Rock, Arkansas. (Exhibit 18E).

The State agency psychological consultant, M. Hope Jackson, Ph.D., who examined the evidentiary record on August 1, 2014, concluded that the claimant possessed the severe impairments of Affective Disorders and Anxiety Disorders. With respect to the "B" criteria, Dr. Jackson opined that the claimant had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. In the Mental Residual Functional Capacity Assessment dated August 1, 2014, Dr. Jackson opined that the claimant was able to understand, remember, and carry out short and simple instructions, that he was able to concentrate and attend for two-hour periods, that his contact with the general public should not be a usual job duty, that supervision should be direct and non-confrontational, and that his work setting changes should be minimal, gradual, and fully explained. (Exhibits 2A and 4A).

The undersigned propounded medical expert interrogatories to clinical psychologist John W. Davis, Ph.D., on October 16, 2015. In his responses to the interrogatories on October 31, 2015, Dr. Davis stated that, some 20 years after his discharge from the Army, the claimant became aware that he had PTSD. Dr. Davis indicated that this diagnosis seemed to be based on the opinion of one main treatment provider. Dr. Davis pointed out that the claimant admitted to essentially every PTSD symptom that he was asked about, and that he had also periodically been diagnosed with OCD and Depression. Dr. Davis noted that the claimant had seldom been hospitalized for issues, and that a review of the records revealed that mental status examinations were essentially within normal limits. (See Exhibit 3F at page 4 and 89; 4F at pages 92, 102, 131, and 155; 10F at pages 25, 71, 84, and 109; 14F at pages 5, 9, 11, and 13). Dr. Davis further noted that the claimant worked for many years after his discharge. Dr. Davis stated that he considered Listings 12.04 and 12.05, but he was unable to find support for meeting or equaling a listing. Dr. Davis further opined that the claimant had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. Finally, Dr. Davis opined that the claimant was capable of returning to previously held jobs or any one step or two step repeat jobs. (Exhibits 17F and 18F).

In conjunction with his interrogatory responses, Dr. Davis completed a

Medical Source Statement (MSS) of the claimant's ability to do work-related mental activities. In the MSS, Dr. Davis opined that the claimant's abilities to understand, remember, and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting were only mildly impaired. Dr. Davis further opined that the claimant's abilities to understand, remember, and carry out simple instructions and to make judgments on simple work-related decisions were not impaired. (Exhibit 18F).

Based on the claimant's representative's objection to Dr. Davis' interrogatories and the representative's request that he be allowed to cross-examine Dr. Davis regarding his interrogatory responses, Dr. Davis appeared and testified as a medical expert witness at a supplemental hearing held on February 24, 2016. (Exhibit 16E). Dr. Davis stated that he had read the file and had listened to the claimant's testimony at the October 16, 2015 hearing. In his hearing testimony, Dr. Davis stated that he knew Dr. Douglas Ewing, the claimant's VA psychiatrist, and that he considered Dr. Ewing to be a competent psychiatrist. However, Dr. Davis testified that he was unable to give Dr. Ewing's opinion that the severity of the claimant's PTSD rendered him unable to engage in employment great weight for two main reasons. First, Dr. Davis pointed out that the fact that the claimant presented with severe symptoms of PTSD after working 20 years was very unusual. Second, Dr. Davis stated that throughout the record in this case, including the most recent evidence submitted in Exhibit 21F, the notes consistently reflect that the claimant's mental status exam is completely normal. Dr. Davis noted that the claimant had been seen and examined by numerous treatment providers who found the claimant's mental status exam to be completely normal. Dr. Davis testified that those are the factors upon which he based his opinions in the medical expert interrogatories, as well as his conclusion that Dr. Ewing's opinions could not be assigned much weight.

The undersigned points out that, in his examination of Dr. Davis, the claimant's representative endeavored to elicit testimony from Dr. Davis on the issue of whether "delayed onset PTSD" is a legitimate disorder and, as such, provides an explanation for the fact that the claimant did not present for treatment of his disorder until 17 years after his military service ended. In his February 25, 2016 brief in which he objected to the medical expert interrogatories completed by Dr. Davis on October 31, 2015 and to the medical testimony given by Dr. Davis at the February 24, 2016 hearing, the claimant's representative stated that Dr. Davis

"refused to believe that late onset PTSD is a legitimate disorder, but admitted in his hearing testimony that there was a debate about that issue within the psychiatric community." (Exhibit 19E). This assertion somewhat mischaracterizes Dr. Davis' testimony on this issue. A review of Dr. Davis' testimony reveals that he did not take a firm position on the issue. Rather, he pointed out that there was a lot of disagreement about the issue in the psychiatric community because some thought that it was possible, but others thought that it was unusual not to have any symptoms and then 20 years later, after a 20-year work history, to begin having those problems. Dr. Davis simply reiterated that this was one of the factors in evidence in this case he relied on in forming his opinions regarding the severity of the claimant's mental impairments and corresponding functional limitations.

The claimant's representative also questioned Dr. Davis regarding the potential effects the combination of several prescribed medications could have on an individual. The claimant's representative pointed out that the record indicated that the claimant was currently being prescribed four different medications for mental health conditions (Exhibit 21F at page 1) and asked Dr. Davis about the potential side effects of those medications. Dr. Davis testified that those medications could potentially affect the claimant's energy, cause drowsiness, and impair his ability to operate an automobile. When asked about the potential interaction and effects of a combination of prescribed medications, Dr. Davis testified that the combination of six medications had an 80 percent probability of negative interaction, and a combination of eight medications had a 100 percent probability of negative interaction. Dr. Davis also testified that, since the claimant was taking four medications for his mental health problems, as well as other medications for diabetes, it was "probable" that the combination of medications could have a negative impact on the claimant's day to day functioning. In his February 25, 2016 brief, the claimant's representative noted that Exhibit 21F reflected that the claimant is currently taking more than eight medications. However, of the numerous medications the claimant's representative listed from Exhibit 21F, only four of those medications are clearly prescribed for the claimant's mental health symptomatology, while three could be prescribed for either the claimant's hypertension or anxiety, and many are benign medications such as aspirin, vitamin D, a topical analgesic cream, a non-steroidal anti-inflammatory drug, and an enzyme for lactose intolerance. Nevertheless, the claimant's representative again mischaracterized Dr. Davis' testimony when he stated that "Dr. Davis declined to opine on how that would impact the Claimant." As noted above, Dr. Davis stated that it was "probable" that the combination of the claimant's medications could have a negative impact on the claimant's day to day functioning, and Dr. Davis further indicated that the opinions he provided in his responses to the ME interrogatories remained unchanged. The

undersigned has considered all of Dr. Davis' opinions and testimony, including his statement at [sic] to the probability of the negative impact of the claimant's numerous prescription medications on his functional capacity, and has assigned Dr. Davis' opinions partial evidentiary weight.

Finally, the claimant's representative argued that Dr. Davis' opinions in his responses to the ME interrogatories and in his hearing testimony were not consistent with "the other evidence of record." The representative went on to list the claimant's subjective complaints of symptoms recorded in the March 25, 2014 treatment note in Exhibit 3F at pages 2-3. While Dr. Davis' opinions may not be consistent with the claimant's subjective complaints of symptoms or with Dr. Ewing's opinions that the claimant's mental impairments prevent him from being employable, his opinions are consistent with the documented results of mental status examinations performed by numerous mental health treatment providers throughout the relevant period under consideration. Additionally, Dr. Davis' opinions do not concern issues reserved for the Commissioner, as do Dr. Ewing's opinions.

* * *

In social functioning, the claimant has moderate difficulties. The claimant has alleged that he has difficulty getting along with others, that he is quick-tempered, and that he does not like crowds. (Exhibits 8E and 14F at page 8). The claimant's wife also reported that she observed the claimant demonstrate similar issues in the past. (Exhibits 2E and 4E). However, during the claimant's 2015 residential PTSD treatment program at the VA, the mental health treatment providers noted that the claimant progressed in increasing socialization with his peers. (Exhibit 12F at page 36). The claimant has also reported that he attends church. (Exhibit 8E). There is no direct evidence that the claimant has demonstrated an inability to interact with others on at least a basic level sufficient to allow him to shop for his personal needs, drive an automobile, attend medical appointments, and attend church. Dr. Jackson, the State agency psychological consultant, opined that the claimant had a moderate degree of restriction in his ability to maintain social functioning. The non-examining medical expert witness, Dr. Davis, opined that the claimant had … mild difficulties in maintaining social functioning. (Exhibit 18F). The examining VA psychologist, Dr. Jennifer Jackson, opined that the claimant's "occupational and social impairment" caused "reduced reliability and productivity," which indicates some degree of functional impairment, but not severe or debilitating impairment that would totally preclude reliability and productivity. (Exhibits 2A, 4A, and 7F). Therefore, the undersigned concludes that the opinion of the examining VA psychologist is consistent with a moderate degree of impairment in this

area of functioning.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant reported that he has difficulty paying attention. (Exhibit 8E). During the claimant's 2015 residential PTSD treatment program at the VA, the mental health treatment providers noted that the claimant was mostly attentive to the group discussions, although he appeared to struggle with wakefulness at times. (Exhibit 12F at page 37). None of the treating or examining mental health providers observed that the claimant demonstrated any deficiencies in his ability to maintain concentration and attention during mental status examination. For example, on mental status examination of the claimant on October 20, 2014, VA staff psychologist Dr. Susan Rhodes observed that the claimant's attention, concentration, and memory appeared adequate. (Exhibit 10F at pages 83-84). Dr. Davis opined that the claimant had mild difficulties in maintaining concentration, persistence, or pace. (Exhibit 18F). The State agency psychological consultant opined that the claimant had a moderate degree of restriction in his ability to maintain concentration, persistence, or pace. (Exhibits 2A and 4A).

\* \* \*

**5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant is unable to climb ladders, ropes, or scaffolds; the claimant can occasionally climb ramps or stairs; the claimant can occasionally stoop, kneel, crouch, and crawl; the claimant can have no exposure to unprotected heights or hazardous machinery; the claimant is limited to simple, routine tasks; the claimant can tolerate occasional changes in a routine work setting; the claimant can have no direct interaction with the public; and the claimant can work in close proximity to others but he must work independently, not in a team.**

\* \* \*

The claimant testified that the primary problem that prevents him from working is that he goes to mental health classes a lot. The claimant also alleged that he takes three medications for anxiety three times a day, two medications to help him sleep, and medications for high blood pressure, diabetes, cholesterol, and for his back and chest. The claimant testified that the medications slow him down and cause him not to be quick to get angry and make him calmer. The claimant also testified that he was overwhelmed by situational stressors related to his incarceration for domestic violence and the requirement to attend

classes related to legal charges, as well as to his cancer diagnosis, which was more than he could handle. However, the claimant stated that he did not think anything was wrong with him, that he had issues to deal with that no one understood.

* * *

Additionally, the undersigned finds that, in order to accommodate the claimant's affective and anxiety disorders, the claimant is limited to the performance of simple, routine tasks and, although he can tolerate occasional changes in a routine work setting, his mental health symptomatology associated with his PTSD and depression requires that he have no direct interaction with the public. Moreover, although the claimant can work in close proximity to others, he must work independently, not in a team.

These non-exertional limitations are consistent with and supported by the medical evidence of record, including the documented results of mental status examinations performed in 2014 and 2015, documented observations of the claimant's mental health treatment providers, the opinions of the examining VA psychologist, Dr. Jennifer Jackson, the opinions of the non-examining State agency psychologist, Dr. Hope Jackson, and the opinions of the medical expert witness, clinical psychologist Dr. John Davis. Dr. Jennifer Jackson concluded that the claimant had "occupational and social impairment with reduced reliability and productivity" secondary to his PTSD and depression. While her opinion reflects a reduction in the claimant's mental functional capacity, it does not indicate that the claimant was precluded from understanding, remembering, and carrying out short and simple instructions or from concentrating and attending for two hour periods, which is the mental residual functional capacity the non-examining State agency psychologist, Dr. Hope Jackson, assigned the claimant. Dr. Hope Jackson's mental residual functional capacity is wholly consistent with Dr. Jennifer Jackson's opinion of the claimant's mental capacity because Dr. Hope Jackson also concluded that the claimant's contact with the general public should not be a usual job duty and work setting changes should be minimal, gradual, and fully explained, which correlates to Dr. Jennifer Jackson's assessment of the level of the claimant's occupational and social impairment.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 96-4p. The undersigned has also considered opinion evidence in

accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In reaching a conclusion as to the claimant's degree of functional limitation in the "B criteria," as well as to the claimant's mental residual functional capacity, the undersigned carefully considered the correlation of the objective medical evidence such as mental status examination findings and documented observations of the claimant by the mental health treatment providers throughout the relevant period under consideration with the numerous opinions from treating, examining, and non-examining sources in the record. The undersigned has assigned great weight to the opinions of the non-examining State agency psychological consultant, Dr. Hope Jackson, in Exhibits 2A and 4A. Dr. Jackson's opinions regarding the claimant's mental capacities and limitations are generally consistent with the totality of the medical evidence of record, as well as being consistent with the information received at the hearing level. Dr. Jackson's opinions of no greater than moderate limitation in any functional area, as well as her opinions of the claimant's mental residual functional capacity, are consistent with and supported by the preponderance of the evidence in this case.

The undersigned has also assigned great weight to the opinion of the examining VA psychologist, Dr. Jennifer Jackson, who completed an Initial PTSD Disability Benefits Questionnaire on the claimant on June 19, 2014 and opined that the claimant's PTSD and Unspecified Depressive Disorder caused "occupational and social impairment with reduced reliability and productivity." (Exhibit 7F at pages 39-46). Dr. Jackson's opinion is generally consistent with the record as a whole and with the claimant's residual functional capacity, as well as being supported by relevant evidence of record.

* * *

The undersigned has assigned partial weight to the opinions of the non-examining medical expert witness, Dr. John Davis, as set out in his responses to the medical expert interrogatories, which includes his opinions in the mental RFC form, as well as his testimony at the supplemental hearing. Dr. Davis' opinions are based on his review of all the medical evidence of record and a summary of the claimant's hearing testimony. The additional mental limitations in the claimant's residual functional capacity, beyond those endorsed by Davis, accommodate the claimant's subjective complaints that are consistent with the information recorded by the VA mental health treatment providers and the examining psychologist, Dr. Jackson. Dr. Davis' assessment of the claimant's degree of functional limitation in the "B"

criteria slightly understates the claimant's degree of limitation as reflected in the treatment records, but his opinion that the claimant can do "simple repeat jobs," is consistent with the totality of the medical and other evidence of record, including the claimant's own reports of his activities of daily living. For these reasons, as well as those previously set forth above in this decision, Dr. Davis' opinions can be afforded only partial evidentiary weight.

The undersigned recognizes that 20 CFR 404.1527(d)(2), 416.927(d)(2), and Social Security Ruling 96-2p require that a treating source's medical opinion on the nature and severity of a claimant's impairments must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with other substantial evidence in the record. Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. Good cause exists if the opinion is not bolstered by the evidence, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the physician's own medical records. (Phillips v. Barnhart, 357 F.3d 1232, 1241, 1242 (11th Cir. 2004); Lewis v. Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997).

The undersigned finds that, in the present case, good cause exists to justify not assigning controlling evidentiary weight to Dr. Ewing's opinions in Exhibits 12E, 4F, 5F, and 9F. In fact, the undersigned has assigned only partial weight [to] Dr. Ewing's opinions. Dr. Ewing's opinions that the clamant is "totally incapacitated for further performance of his duty" and is incapable of "functioning in the workplace" obviously indicate that the claimant's mental impairments cause him some functional limitations, but those opinions concern issues reserved to the Commissioner. Social Security Rulings 96-2p and 96-5p indicate that a physician's opinion on issues reserved to the Commissioner of Social Security is never entitled to controlling weight or special significance. Examples of opinions that may not be given controlling weight are opinions about what an individual's residual functional capacity is and whether an individual is disabled. Therefore, those opinions cannot be given controlling weight. Although Dr. Ewing's opinions in the April 9, 2014 letter and the April 2014 and July 2015 forms provide no quantifiable mental functional limitations and are conclusory, those opinions can be accepted only to the extent they reflect at most moderate limitation.

The undersigned further finds that Dr. Ewing's opinions are without objective or persuasive corroborating evidence in the longitudinal record. Dr. Ewing's statements that the claimant experiences

"significant distress related to his PTSD," symptoms of "poor concentration," "persistent morbid thoughts," and "chronic suicidal ideation," are not supported by the information recorded in his own treatment records, or in the treatment records of the claimant's treating psychologist, Dr. Susan Rhodes. Dr. Ewing's and Dr. Rhodes' treatment notes contain no significantly abnormal mental status examination findings or documentation of complaints of severe mental health symptoms. The claimant saw Dr. Ewing on April 9, 2014 and reported an exacerbation of his PTSD symptoms over the previous two weeks. However, the claimant's MSE was within normal limits, with the claimant's reported as being "better now." (Exhibit 4F at pages 90-93). A VA mental health nursing note dated April 28, 2014 reflects that the claimant scored a 4 on the PHQ-9 depression screen, which was suggestive of no depression. (Exhibit 4F at page 89). On July 7, 2014, Dr. Ewing noted that the claimant was less anxious and irritable and that he reported overall better mood and sleep, even though he continued to experience nightmares at variable frequency. Dr. Ewing also noted that the claimant's MSE on that date was within normal limits. (Exhibit 7F at pages 37-38). Although the claimant reported having "self-injurious thoughts" at his September 22, 2014 visit with Dr. Ewing, no observations of abnormal behavior and no abnormal MSE findings were recorded. In fact, Dr. Ewing noted that the claimant's mood brightened during the visit, that he smiled broadly, and that he denied active suicidal intent. (Exhibit 7F at page 19).

Statements made by the claimant's treating VA psychologist, Dr. Rhodes, in her June 30, 2015 treatment note bolster one of the reasons that Dr. Davis' gave as basis for discounting Dr. Ewing's opinions, i.e, that Dr. Ewing assumed the role of advocate for the claimant. In her treatment note, Dr. Rhodes addresses the claimant's concern that she did not complete a form regarding the claimant's Compensation and Pension claim because she did not believe the claimant deserved or needed the disability pension. Dr. Rhodes explained that she had been told by her management that completing the disability evaluation form was a "conflict of interest" and was supposed to be completed by his C&P examiners only. (Exhibit 10F at page 106).

At the supplemental hearing, and in his February 25, 2016 post-hearing brief, the claimant's representative sought to discount Dr. Davis' opinions alleging that Dr. Davis "downplayed" the claimant's inpatient mental health treatment at the VA facilities, the most recent of which was in March 2015, with an upcoming admission scheduled for some time in the near future. However, the information contained in the VA treatment records bolsters Dr. Davis' opinion that the claimant's

admissions to the VA PTSD treatment programs did not tend to support Dr. Ewing's opinions. Specifically, the VA treatment records document that, prior to his admission to the PRRTP program on March 31, 2015, the claimant was initially denied acceptance into the residential program in 2014 because he had not attempted a lower level of care. (Exhibit 10F at page 47). The claimant was referred back to his primary mental health care provider to explore other treatment options. Next, the record shows that the claimant postponed his admission to the residential treatment program for over three months. The VA records document that the claimant was scheduled for admission to the PTSD clinic on December 19, 2014, but the claimant requested a later date. The claimant was given a new admission date of January 30, 2015, but he again postponed the admission. (Exhibit 1OF at pages 51, 55, and 68). It is more than reasonable to expect that the claimant would not have repeatedly postponed his admission to the PTSD clinic/program, and for such a prolonged period of time, if he, in fact, experienced the mental health symptomatology in the severity, frequency, and duration that he alleged. The claimant's allegations form the basis for Dr. Ewing's opinions that the claimant has significant and incapacitating mental health symptomatology. Therefore, the undersigned finds that the claimant's actions both undermine support [for] Dr. Ewing's opinions and bolster those of Dr. Davis. (Exhibit 10F at pages 74-77).

* * *

The claimant's allegations of severe functional limitations secondary to ongoing mental health symptomatology are also not fully supported by the information contained in the medical and mental health treatment records. It is well established that the claimant has received formal mental health treatment for PTSD and depression during the relevant period under consideration, and that treatment has consisted of up to four psychotropic medications, PTSD classes, and individual therapy. Although the claimant endorses chronic symptoms of PTSD and some depression for at least the past 10 years, he was able to work successfully, without significant mental limitation, for over 20 years after he completed his military service. The undersigned's conclusion that the claimant's mental impairments cause him no more than moderate functional limitations and that he has the residual functional capacity set out above in this decision is supported by the opinions of the examining psychologist, Dr. Jennifer Jackson, the non- examining State agency psychological consultant, Dr. Hope Jackson, and the non-examining medical expert, Dr. Davis.

The undersigned finds that the claimant's symptoms related to his mental impairments cause moderate limitations, but not the extreme

limitations the claimant has alleged or cited by his treating psychiatrist, Dr. Ewing. This conclusion is supported not only by the lack of abnormal mental status examination findings since the alleged disability onset date and by the opinions of the examining and non-examining psychologists, but also by the claimant's own statements regarding his mental impairments. At his visit with his psychiatrist a little over six weeks prior to his AOD, the claimant made no complaints of significant mental health symptomatology, other than feeling a bit depressed over his diagnosis of prostate cancer. However, the next time he saw his psychiatrist, approximately seven weeks later, the claimant identified a litany of mental health symptoms, with no obvious traumatic or triggering event reported. However, Dr. Ewing noted that the claimant's MSE on March 25, 2014 was remarkable only for "low" mood and "mild to moderately glum" affect. All other aspects of the claimant's MSE on that date were within normal limits. A VA mental health nursing note dated April 28, 2014, one month later, reflects that the claimant scored a "4" on the PHQ-9 depression screen, which was suggestive of no depression. (Exhibits 4F at page 89 and 7F at page 49).

On April 9, 2014, the claimant reported an exacerbation of his PTSD symptoms over the previous two weeks. However, the claimant's MSE was within normal limits, with the claimant's mood reported as being "better now." (Exhibit 4F at pages 90-93). At the claimant's regularly scheduled psychiatric follow-up visit on July 7, 2014, Dr. Ewing noted that the claimant was less anxious and irritable and that he reported overall better mood and sleep, even though he continued to experience nightmares at variable frequency. Dr. Ewing also noted that the claimant's MSE on that date was within normal limits. (Exhibit 7F at pages 37-38). Although the claimant reported having "self-injurious thoughts" at his September 22, 2014 visit with Dr. Ewing, no observations of abnormal behavior and no abnormal MSE findings were recorded. In fact, Dr. Ewing noted that the claimant's mood brightened during the visit, that he smiled broadly, and that he denied active suicidal intent. (Exhibit 7F at page 19). At the claimant's visit with Dr. Ewing on May 20, 2015, the claimant again reported that he had been discharged from PRRTP and that his mood and sleep were better and that he was less anxious/irritable. Dr. Ewing again noted no abnormal MSE findings. (Exhibit 10F at pages 115- 116).

At the October 16, 2015 hearing, the claimant testified that, in his opinion, he thought nothing was wrong with him mentally. The claimant did not provide any testimony at the hearing as to any specific mental limitations or symptoms, aside from some situational anxiety and

depression. In fact, the claimant's hearing testimony is generally consistent with Dr. Davis' opinions. (See Exhibit 7F at page 46).

(Tr. 38-44, 50-51, 52-60).

## V. DISCUSSION

A claimant is entitled to an award of SSI benefits if the claimant is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of not less than 12 months. *See* 20 C.F.R. § 416.905(a). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation in determining whether the claimant is disabled:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairment in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the

burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

If the claimant appeals an unfavorable ALJ decision, the reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. When a decision is supported by substantial evidence, the reviewing court must affirm "[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

Robinson asserts one ground in support of his contention that the ALJ erred in concluding that he was not entitled to benefits: he argues that the ALJ's residual functional capacity ("RFC") assessment is not supported by substantial evidence because she erred in her evaluation of Dr. Jennifer Jackson's opinion regarding his mental functional limitations. (Doc. 9 at p. 3). Conversely, the Commissioner asserts that the ALJ properly applied the five step sequential

process in making her determination, including her assessment of Robinson's RFC. After concluding that Robinson had the following severe impairments: prostate cancer, obesity, diabetes mellitus, osteoarthrosis, essential hypertension, anxiety disorders, and affective disorders, the ALJ found Robinson to have the RFC to perform medium work, with certain limitations, set forth as follows:

> the Plaintiff is limited to simple, routine tasks; the Plaintiff can tolerate occasional changes in a routine work setting; the Plaintiff can have no direct interaction with the public; and the Plaintiff can work in close proximity to others but he must work independently, not in a team.

(Tr. 52).

A claimant's RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. It is an "administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2. It represents ***the most, not the least***, a claimant can still do despite his or her limitations. 20 C.F.R. § 404.1545; SSR 96-8p, 1996 WL 374184, at *2 (emphasis added). The RFC assessment is based on "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). In assessing a claimant's RFC, the ALJ must consider only limitations and restrictions attributable to medically determinable impairments, i.e., those which are demonstrable by objective medical evidence. SSR 96-8p, 1996 WL 374184, at *2. Similarly, if the

evidence does not show a limitation or restriction of a specific functional capacity, the ALJ should consider the claimant to have no limitation with respect to that functional capacity. Id. at *3. The ALJ is exclusively responsible for determining an individual's RFC. 20 C.F.R. § 404.1546(c).

Robinson asserts that the portion of the RFC that addresses his mental limitations was not supported by substantial evidence because, while according great weight to the opinion of Dr. Jennifer Jackson, the ALJ did not include all of the restrictions she assigned. Specifically, Robinson argues that the ALJ's mental RFC assessment did not properly take into consideration Dr. Jennifer Jackson's opinion that he has difficulty in adapting to stressful circumstances, including a work-like setting, that he has problems with concentration, and that he, at times, exhibits irritable behavior and angry outbursts. (Doc. 9 at p. 5). It is well-settled that the ultimate responsibility for determining a claimant's RFC, in light of the evidence presented, is reserved to the ALJ, not to the claimant's physicians or other experts. *See* 20 C.F.R. § 404.1546. "[T]he ALJ will evaluate a [physician's] statement [concerning a claimant's capabilities] in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ." *Green v. Soc. Sec. Admin.,* 223 F. App'x 915, 923 (11th Cir. 2007); *see also Pritchett v. Colvin*, Civ. A. No. 12-0768-M, 2013 WL 3894960, at *5 (S.D. Ala. July 29, 2013) (holding that "the ALJ is responsible for determining a claimant's RFC"). "To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has 'provide[d] a sufficient rationale to link' substantial record evidence 'to the legal conclusions reached.'" *Jones v. Colvin*,

CA 14-00247-C, 2015 WL 5737156, at *23 (S.D. Ala. Sept. 30, 2015) (quoting

*Ricks v. Astrue*, No. 3:10-cv-975-TEM, 2012 WL 1020428, at *9 (M.D. Fla. Mar.

27, 2012) (internal quotation marks and citations omitted)).

A review of the entire record reveals that the ALJ was presented with

multiple opinions regarding Robinson's mental functional limitations. In this case,

as set forth above, the ALJ discussed the medical evidence in detail, including the

weight accorded to the medical opinion evidence and the grounds therefor. The

ALJ also described the information provided by Robinson in his Function Report

and at the hearing concerning his limitations and activities, and she explained her

reasons for finding that Robinson was not entirely credible. Robinson has not

actually pointed to any specific finding in the RFC that was not supported by

evidence. Rather, he claims there is evidence that supports a finding of more

limitations than set forth in the RFC. He argues that the mental limitations set forth

in the RFC do not fully take into account Dr. Jennifer Jackson's opinion that

Robinson's PTSD causes clinically significant distress or impairment in social,

occupational, or other important areas of functioning, including difficulty in

adapting to stressful circumstances, problems with concentration, and problems

with irritable behavior and angry outbursts. (Doc. 9 at p. 5). However, the Court

finds that the ALJ's decision demonstrates that she did take these opinions of Dr.

Jennifer Jackson into account when formulating Robinson's RFC. Specifically, the

ALJ found:

> Additionally, the undersigned finds that, in order to
> accommodate the claimant's affective and anxiety disorders, the
> claimant is limited to the performance of simple, routine tasks
> and, although he can tolerate occasional changes in a routine

work setting, his mental health symptomatology associated with his PTSD and depression requires that he have no direct interaction with the public. Moreover, although the claimant can work in close proximity to others, he must work independently, not in a team.

These non-exertional limitations are consistent with and supported by the medical evidence of record, including the documented results of mental status examinations performed in 2014 and 2015, documented observations of the claimant's mental health treatment providers, the opinions of the examining VA psychologist, Dr. Jennifer Jackson, the opinions of the non-examining State agency psychologist, Dr. Hope Jackson, and the opinions of the medical expert witness, clinical psychologist Dr. John Davis. Dr. Jennifer Jackson concluded that the claimant had "occupational and social impairment with reduced reliability and productivity" secondary to his PTSD and depression. While her opinion reflects a reduction in the claimant's mental functional capacity, it does not indicate that the claimant was precluded from understanding, remembering, and carrying out short and simple instructions or from concentrating and attending for two hour periods, which is the mental residual functional capacity the non-examining State agency psychologist, Dr. Hope Jackson, assigned the claimant. Dr. Hope Jackson's mental residual functional capacity is wholly consistent with Dr. Jennifer Jackson's opinion of the claimant's mental capacity because Dr. Hope Jackson also concluded that the claimant's contact with the general public should not be a usual job duty and work setting changes should be minimal, gradual, and fully explained, which correlates to Dr. Jennifer Jackson's assessment of the level of the claimant's occupational and social impairment.

(Tr. 53-54).

This Court's role in review of claims brought under the Social Security Act is a narrow one. Having reviewed the evidence and considered the arguments made by Robinson and being mindful of the admonishment that the reviewing court may not reweigh the evidence or substitute its judgment for that of the Commissioner, the Court finds that the assessment made by the ALJ was

supported by substantial evidence. The opinions of Dr. Jennifer Jackson, Dr.

Hope Jackson, and Dr. Davis, along with other evidence in the record, constitutes

substantial evidence supporting the ALJ's RFC assessment, as well as her final

decision.

### **CONCLUSION**

In light of the foregoing, it is **ORDERED** that the decision of the

Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **8th** day of **February, 2018**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**